NUMBER 13-05-598-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


OFFICE OF THE ATTORNEY

GENERAL, Appellant,


v.



LISA MURILLO AND RACHEL

SARABIA, Appellees.

 


On appeal from the 398th District Court of Hidalgo County, Texas.


 


MEMORANDUM OPINION



Before Justices Hinojosa, Yañez, and Castillo


Memorandum Opinion by Justice Yañez


 

 Lisa Murillo brought suit against the Office of the Attorney General ("the OAG"),
asserting wrongful termination under the Texas Whistleblower Act. (1) The OAG filed a plea
to the jurisdiction, contending that Murillo did not make a good-faith report of a violation of
law. The trial court denied the plea and the OAG appealed. We affirm the trial court's
denial of the OAG's plea to the jurisdiction.

Background

 Murillo was an employee of the OAG and the Unit Supervisor of the OAG Child
Support Unit in McAllen, Texas. At the OAG, Murillo supervised two other employees: 
Norma Elsik and Belinda Diaz. On December 16, 2002, Elsik told Murillo that she saw Diaz
place a confidential child support document into Diaz's tote bag, presumably to take the
documents home. Murillo subsequently reported Diaz's conduct to her supervisor, Rachel
Sarabia. Sarabia instructed Murillo to report the incident to Barbara VanderVoord, the
managing attorney for the Unit. Murillo complied with Sarabia's directive and relayed the
information to VanderVoord.

 In May 2003, for reasons that are in dispute, Murillo was discharged from
employment with the OAG. Murillo then filed this suit against the OAG under the Texas
Whistleblower Act ("the Act"), (2) alleging that she was terminated for reporting a violation of
law, stemming from Diaz's conduct. The OAG subsequently filed its First Amended Plea
to the Jurisdiction in response to Murillo's Fourth Amended Original Petition. At a
preliminary hearing on the OAG's plea, Murillo submitted an affidavit and provided
testimony in response to the plea. The OAG objected on the basis of the affidavit and
testimony being a "sham," but the trial court overruled the objection and denied the plea. (3) 
On appeal, the OAG contends the trial court erred in denying its plea for the following
reasons: (1) Murillo is not a "public employee;" (2) a "report" was not made; (3) a "violation
of law" was not reported; (4) the court should have disregarded Murillo's affidavit and
testimony; and (5) Murillo did not have a "good faith" belief that the law had been violated. (4)

Discussion

 A plea to the jurisdiction is a dilatory plea; its purpose is "to defeat a cause of action
without regard to whether the claims asserted have merit." (5) Subject matter jurisdiction is
a question of law subject to de novo review. (6) In performing this review, we do not look to
the merits of the case, but consider only the pleadings and evidence relevant to the
jurisdictional inquiry. (7) The plaintiff has the burden to allege facts affirmatively
demonstrating that the trial court has subject-matter jurisdiction. (8) Sovereign immunity from
suit deprives a trial court of subject-matter jurisdiction and, thus, is properly asserted in a
plea to the jurisdiction. (9)

 The cause of action created in the Whistleblower Act is purely statutory. To prevail
on her cause of action, Murillo must allege the existence of each of the following elements:
(1) she is a public employee; (2) she acted in good faith in making her report; (3) the report
involved a violation of law; (4) the report was made to an appropriate law enforcement
authority; and (5) she suffered retaliation as a result of making the report. (10)

"Public Employee"

 In the first issue, the OAG asserts that while the Act was intended to protect public
employees, it was not meant to protect employees who work in a supervisory or managerial
capacity. Therefore, since Murillo held a supervisory position with the OAG, the Act is
inapplicable to her. No authority was cited to support the distinction drawn by the OAG and
we have found no supportive authority ourselves. 

 The Texas Whistleblower Act prohibits a governmental entity from terminating "a
public employee who in good faith reports a violation of law by the employing governmental
entity or another public employee to an appropriate law enforcement authority." (11) "Public
employee" is defined by the Act as "an employee or appointed officer other than an
independent contractor who is paid to perform services for a state or local governmental
entity." (12) Because this definition does not distinguish between public employees who
assume a supervisory role and those who do not, and because it is undisputed that Murillo
was an employee and not an independent contractor, we find that Murillo was a "public
employee" as defined by the Act. Accordingly, the OAG's first issue is overruled.

"Report"

 The OAG contends that Murillo did not make a "report" because she simply
repeated information previously obtained from Elsik. According to the OAG, when a
supervisor takes a report from her employee and merely relays that information to her
supervisor, then a report has not been made within the meaning of the Act. The OAG cites
no authority to support its argument, and its cursory argument in support of its position is
unpersuasive.

 In Castaneda v. Tex. Dep't of Agric., we determined that the Act should be
interpreted "liberally to achieve its remedial purpose. (13) A liberal construction does not
restrict the statute, but enlarges its scope and effect to effectuate the true legislative
purpose." (14) In holding so, we declined to engraft onto the Act, contrary to the State's
urging, "the additional requirement that the whistle blower 'initiate' a report." (15) Our
reasoning in Castaneda is equally applicable to the issue before us, and we assert it here
accordingly. (16) The OAG's second issue is overruled.

"Violation of Law"

 The OAG asserts that Murillo did not a report a violation of law to Sarabia and
VanderVoord because she never discussed what laws she believed had been violated. 
We have held, however, that "an employee need not identify a specific law when making
a report[.]" (17) Therefore, the OAG's third issue is overruled. (18)

"Sham" Affidavit

 In the fourth issue, the OAG contends the trial court erred in refusing to disregard
Murillo's affidavit and testimony, which were offered in opposition to the OAG's plea to the
jurisdiction. The OAG objected to the affidavit, because it was a "sham," and to the
testimony because it simply reiterated what was stated in the affidavit. According to the
OAG, Murillo's affidavit should have been disregarded because it materially changed her
testimony, without explanation, from that given by her in an earlier deposition. (19) The
discrepancies in Murillo's testimony essentially relate to whether she believed she was
reporting a violation of law when she apprised Sarabia and VanderVoord of Diaz's
actions. (20)

 On August 9, 2004, Murillo testified in her deposition to the following:


 Q: Now, you said that you reported a violation of law in December of 2002?

 

 A: I- all I reported was that Ms. Diaz was taking home a case screen.

 

 Q: Okay. But do you understand in the pleadings in this lawsuit you're
alleging that a violation of law has occurred?

 

 A: Yes.

 

 Q: Okay. Now, what law are you alleging has been violated?

 

 A: That's going to have to be referred to my attorney on that.

 

 Q: Okay. So you don't know? You don't have a- you don't have knowledge
as to what law you're saying is being- was being violated by Belinda Diaz?

 

 A: Oh, okay. Belinda- I don't know anything about Belinda Diaz, sir.

 

 . . . .

 

 Q: And do you believe that when Ms.- when Norma Elsik reported that
Belinda Diaz was taking home case screens, do you believe that that was a
violation of law?

 

 A: The way I saw it, it was something that was not right, so I needed to
report it.

 

 . . . .

 

 Q: Do you remember what words you used or what you told [Sarabia]?

 

 A: I said, "Norma Elsik just reported that she saw Belinda Diaz put a case
notepad in her tote bag."

 

 . . . .

 

 Q: Now, during that conversation, did you ever mention anything about it's
a violation of law or- or the law or anything?

 

 A: No, sir.

 

 Q: Did you ever mention the policies or- or any policies during that
conversation?

 

 A: No, sir.

 

 . . . .

 

 Q: Okay. But- and what did you tell Ms. VanderVoord?

 

 A: I told her the same thing I had told Ms. Sarabia.


According to the aforementioned testimony, Murillo did not vocalize her belief that Diaz had
violated a law when she reported to Sarabia and VanderVoord. This does not disprove,
however, that Murillo's subjective belief was that a law had been violated. The only insight
the deposition provides concerning her subjective belief is Murillo's statement that she
perceived Diaz's conduct as "something that was not right" and which needed to be
reported.

 On August 19, 2005, about a year after her deposition was taken, Murillo stated the
following in an affidavit:

 When Norma Elsik informed me that Belinda Diaz was taking confidential
case screen material home with her, I knew that Belinda Diaz violated the
law. Employees of the Attorney General's Office are prohibited by law from
taking confidential materials, such as case screens, from the Attorney
General's offices. The confidentiality policies of the Attorney General's
Office state that violations of the confidentiality policies can be grounds for
dismissal and criminal prosecution. . . . Because I knew Belinda Diaz'
conduct was in violation of the law and subject to criminal prosecution, I
knew I had to report Ms. Diaz' violation to my superior, Ms. Sarabia. I could
have merely instructed Ms. Elsik to relay the same information she reported
to me to our superior Ms. Sarabia, but I believed that it was my duty to
advise Ms. Sarabia of Belinda Diaz' conduct and violation of the law.


Through her affidavit, Murillo asserts that she knew Diaz had violated the law when she
made her report. This does not clearly contradict her deposition, whereby she testified that
she knew Diaz's conduct was "something that was not right." Furthermore, we do not find
that affidavit's discussion of applicable law and policy in conflict with the deposition. (21) 
While we recognize that there are variances between Murillo's deposition testimony and
her affidavit testimony, we cannot conclude the differences are so egregious that the
complained-of statements should be disregarded. (22) Accordingly, we conclude that the trial
court did not err in overruling the OAG's objections to Murillo's affidavit and her in-court
testimony. The OAG's fourth issue is overruled.

 "Good Faith"

 The OAG asserts that Murillo did not have a good faith belief that the law had been
violated when she made her report. The Texas Supreme Court has defined the term "good
faith" in the context of the Whistleblower Act to mean that (1) the employee believed that
the conduct reported was a violation of law, and (2) the employee's belief was reasonable
in light of the employee's training and experience. (23) The first prong is subjective and
ensures that an employee seeking a remedy under the Act believed that he was reporting
an actual violation of law. (24) The second prong of the definition is objective and ensures
that, even if the reporting employee honestly believed that the reported act was a violation
of law, the reporting employee only receives Whistleblower Act protection if a reasonably
prudent employee in similar circumstances would have believed that the facts as reported
were a violation of law. (25)

 Mindful of Murillo's deposition and affidavit testimony, already discussed herein, we
conclude that Murillo believed she was reporting a violation of law. (26) Accordingly, we
conclude that the first prong has been satisfied. We next turn our attention to the second
prong, and determine whether a reasonably prudent employee, in circumstances similar
to Murillo's, would have believed that the facts as reported were a violation of law. To meet
the objective prong for a "good faith report," there must be some law in existence
prohibiting the complained-of conduct. (27) "Law," for purposes of the Act, means state or
federal statutes, local ordinances, and rules adopted pursuant to statute or ordinance. (28)

 The OAG asserts that the Act does not protect Murillo because she reported a
violation of the OAG's internal policy, rather than law. In her Fourth Amended Original
Petition, however, Murillo asserts that she reported a violation of the OAG's confidentiality
policy and state law. The state law cited in the petition was section 552.352(a) of the
Public Information Act. (29) This statute states that "[a] person commits an offense if the
person distributes information considered confidential[.]" (30) This includes information that
is considered "to be confidential by law, either constitutional, statutory, or by judicial
decision." (31) The document Diaz removed from the workplace contained information that
has been deemed confidential under section 231.108(a) of the Texas Family Code, (32) thus
placing the information obtained by Diaz within the purview of section 552.352(a). (33)

 According to Murillo's deposition testimony, she reported that "Diaz was taking home
a case screen." (34) We do not believe, however, that Diaz's conduct, by itself, constituted
a violation of section 552.352(a), which prohibits the distribution of information. (35) 
Furthermore, we find that Diaz's conduct, by itself, did not violate any "rule adopted
pursuant to statute[.]" (36) We note, however, that we have interpreted the phrase "reports
a violation of the law," to include "any disclosure of information regarding a public servant's
employer tending to directly or circumstantially prove the substance of a violation of
criminal or civil law, the State or Federal Constitution, statutes, administrative rules or
regulations." (37) In light of this interpretation, it is appropriate to consider whether Diaz's
removal of confidential information from the workplace "tends to circumstantially prove the
substance of a violation." (38) More specifically, we must consider whether Diaz's conduct
circumstantially evidences her distribution of confidential information. At first glance, it is
admittedly difficult to infer that the removal of information from the workplace is per se
indicative of her distribution of that information. We believe, however, that the facts
surrounding this case make such an inference reasonable.

 The deposition testimony of Norma Elsik, which Murillo submitted into evidence in
response to the OAG's plea to the jurisdiction, revealed that Diaz had no reason to
possess the confidential information in question, let alone remove it from the workplace. 
Elsik's deposition stated the following:

 Q: Now, as I understand, at some point you saw- at some point, I think it
was in December of 2002, you witnessed Belinda Diaz take what you
believed to be a confidential file and put it- put the document in her tote bag
and taking [sic] it home with her; is that correct?

 

 A: Yes, sir.

 

 Q: Okay. Would you describe for the ladies and gentlemen of the jury
exactly what happened in your own words from the beginning to the end of
this incident?

 

 A: Okay. I was working on my computer, and at that time she was assigned
to do- send out appointments to the custodial parent, and she was to look
and see if there was [sic] appointments sent before.

 

 Q: Okay.

 

 A: And then after that I just went on about my work. And I guess she came
across this one case, and I guess upon looking to see if there was [sic]
appointments, I guess she started reading and saw that this lady had had a
child by another man.

 And at that time she asked me, she goes, "Norma." She says, "Do
you think- isn't this confidential?" And I said- she goes, "Look at this." I
said, "Look at what?" And she says, "Look at- look what's here in the
computer." And I said, "Well, I can't see from here." And so she went ahead
and printed it out and she brought it over to where I was at. And then she
goes, "Don't you think this is confidential?" And I said, "Well, what?" She
goes, "Where the lady had a child with- by another man. I mean, don't you
think that- you know, I mean, I don't think that her husband should know
about it."

 And I told her, "Well, you know, why not?" And she says, "Well, I
mean, it's confidential, don't you think?" I said, "Yes, it is confidential but, I
mean, if for some reason or another the CSO had to let her current husband
know because she was married, I think, at the time with her husband and, I
mean, he had to know that that child was not his." And she says, "Well, I
don't think he should know." And I said, "Well, I don't know, I mean, that
might be something you might want to address to the supervisor or
something." 

 So that I don't think she ever did, and I saw her with- fold that paper
like in four, you know, fold it up, and I saw her put it in her tote bag because
I looked at her like this and, you know, I saw her put it in her tote bag.

 

 . . . .

 

 Q: Well, if she's asked- if Mrs. Murillo would be asking you to check the files
on certain clients to determine whether or not there was [sic] appointments
for those folks, and you found out that there was [sic] no appointments, then
who would you notify?

 

 A: We would just mark down we had sent the appointment out and
document, appointment sent out.

 

 Q: And who would send out the appointment?

 

 A: The person assigned to that duty as far as whoever was scheduled to do-
send out the appointments.

 

 Q: And that would be an intake worker- and that would be an administrative
tech worker?

 

 A: Yes, sir.

 

 Q: And how would you send out the appointments?

 

 A: Generated through the computer.

 

 Q: A letter?

 

 A: We would send out a letter, yes, sir.

 

 Q: Okay. So that there would be a letter that would be sent out to the client
saying, come in and see a certain caseworker on such-a-such a date?

 

 A: Right.

 

 Q: Okay. And you would do that only in response to a request by Mrs.
Murillo?

 

 A: Yes, sir.

 

 . . . .

 

 Q: All right. So, at that point Belinda was in charge of doing that?

 

 A: Yes, sir. 

 

 Q: And she was reviewing a screen?

 

 A: Yes, sir.

 

 Q: And what is a screen? What was on the screen?

 

 A: Just, I guess, notepads or something. It was just a- the case diary, and
she was- for some reason she was, I guess, looking through the legal history
or something, and she was reading, you know, information about the parties'
case. And that's when she called me and asked me, you know, to look at
this. And I said, "Well, I can't see from where I'm at."

 

 Q: And what is the information that- what did- as best as you can recall,
what was concerning her about the information in the case diary?

 

 A: Where the- I guess where the investigator had sent out or called the lady
the custodial parent's husband or sent him a letter notifying him that he was
not the father of his child, I guess, for him to come and- whatever
procedures they do after that, I don't know, but-

 

 Q: And is it fair to say that the thing that she was supposed to be doing, in
terms of setting an appointment, had nothing to do with that?

 

 A: That's correct.

 

 Q: Okay. She was being a busybody on that information?

 

 A: Right.

 

 Q: You know what a busybody means?

 

 A: Somewhat, yes.

 

 Q: Getting into something-

 

 A: -other than what she was supposed to do.


Elsik's testimony establishes that Diaz's removal of confidential information from the
workplace, in this instance, was highly unusual. Diaz's job assignment did not create a
good reason for her to inquire into, let alone to print out and retain, the confidential material
in question. Furthermore, it is evident that the details surrounding this matter were
imparted to Murillo prior to her report to Sarabia and VanderVoord, and that this
information was later shared by Murillo in her report. (39)

 We also note that Diaz had filed a lawsuit against the OAG prior to December 16,
2002. In her in-court testimony, Murillo stated she knew, at the time of her report, that Diaz
had a lawsuit pending against the OAG. (40) She also testified that she "already had
suspected that [Diaz] was probably up to something," which from the context surrounding
this statement meant that Murillo believed Diaz was supplying confidential information to
her attorney to help her case. (41) Even VanderVoord, in her email, expressed her belief that
Diaz had improperly taken confidential information in the past, and remarked that Diaz
seemed "to be 'building a case' against someone for some reason."

 We have sought to determine whether a reasonably prudent employee in similar
circumstances would have believed that the facts as reported tended to circumstantially
prove the substance of a violation of criminal or civil law. (42) In light of all the aforementioned
evidence, we find that a reasonably prudent employee would have believed that Diaz's
reported conduct was circumstantial evidence of her violating section 552.352(a) of the
Public Information Act. (43) The OAG's fifth issue is therefore overruled.

Conclusion

 Having overruled the OAG's five issues, we accordingly affirm the judgment of
the trial court.


 

 LINDA REYNA YAÑEZ,

 Justice



Justice Errlinda Castillo not participating.


Memorandum opinion delivered and filed 

this the 21st day of December, 2006.
1. See Tex. Gov't Code Ann. § 554.001-.010 (Vernon Supp. 2006).
2. Id.
3. The OAG raised additional objections to Murillo's affidavit; these objections were also denied and
the OAG does not appeal those rulings.
4. The OAG's brief was presented as if containing three arguments. We find, however, that these
arguments are more appropriately addressed as five separate issues, and discussed in the order outlined
herein.
5. Bland Indep. Sch. Dist. v. Blue, 34 S.W.3d 547, 554 (Tex. 2000). 
6. Tex. Natural Res. Conservation Comm'n v. IT-Davy, 74 S.W.3d 849, 855 (Tex. 2002).
7. Tex. Dep't of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 227 (Tex. 2004); County of Cameron v.
Brown, 80 S.W.3d 549, 555 (Tex. 2002).
8. Tex. Ass'n of Bus. v. Tex. Air Control Bd., 852 S.W.2d 440, 446 (Tex. 1993).
9. Miranda, 133 S.W.3d at 224-26; Tex. Dep't of Transp. v. Jones, 8 S.W.3d 636, 637-38 (Tex. 1999).
10. See Tex. Gov't Code Ann. § 554.002(a) (Vernon Supp. 2006); Hill v. Burnet County Sheriff's Dep't
& Burnet County, 96 S.W.3d 436, 440-41 (Tex. App.-Austin 2002, pet. denied). 
11. Tex. Gov't Code Ann. § 554.002(a) (Vernon Supp. 2006).
12. Id. § 554.001(4) (Vernon Supp. 2006). 
13. Castaneda v. Tex. Dep't of Agric., 831 S.W.2d 501, 503 (Tex. App.-Corpus Christi 1992, writ
denied) (citations omitted).
14. Id.
15. Id.
16. We note that we have interpreted the phrase "reports a violation of law" to include "any disclosure
of information regarding a public servant's employer tending to directly or circumstantially prove the substance
of a violation of criminal or civil law, the State or Federal Constitution, statutes, administrative rules or
regulations." Castaneda, 831 S.W.2d at 503-04.
17. Llanes v. Corpus Christi Indep. Sch. Dist., 64 S.W.3d 638, 642 (Tex. App.-Corpus Christi 2001,
pet. denied).
18. We recognize that the OAG raised additional arguments as to why Murillo did not "report a violation
of law." We will address these arguments in issue five.
19. See generally Farroux v. Denny's Rest., Inc., 962 S.W.2d 108, 111 (Tex. App.-Houston [1st Dist.]
1997, no writ). 
20. See generally Wichita County v. Hart, 917 S.W.2d 779, 784-85 (Tex. 1996) (holding that to satisfy
the "good faith" requirement in the whistleblower context, the reporting employee must believe that the
conduct reported was a violation of law).
21. According to the OAG, the affidavit implies that Murillo, at the time of her report, was aware of all
the law discussed therein. The OAG asserts that this contradicts her deposition testimony, which evidences
her lack of knowledge regarding applicable law through the following questions and answers:


 Q: Okay. Now, what law are you alleging has been violated?

 

 A: That's going to have to be referred to my attorney on that.

 

 Q: Okay. So you don't know? You don't have a- you don't have knowledge as to what law
you're saying is being- was being violated by Belinda Diaz?

 

 A: Oh, okay. Belinda- I don't know anything about Belinda Diaz, sir.


We cannot definitively conclude, as the OAG does, that Murillo's decision to refer a question to her attorney
evidences her lack of knowledge. Her following answer, "I don't know anything about Belinda Diaz," is
ambiguous and does not effectively address the question asked. We find it difficult to draw any particular
inference from this response.
22. See Skiles v. Jack in the Box, Inc., 170 S.W.3d 173, 179 (Tex. App.-Dallas 2005, no pet.);
Youngblood v. U.S. Silica Co., 130 S.W.3d 461, 470 (Tex. App.-Texarkana 2004, pet. filed); Shaw v. Maddox
Metal Works, Inc., 73 S.W.3d 472, 478 (Tex. App.-Dallas 2002, no pet.); Cantu v. Peacher, 53 S.W.3d 5, 10
(Tex. App.-San Antonio 2001, pet. denied).
23. Tex. Dep't of Transp. v. Needham, 82 S.W.3d 314, 320 (Tex. 2002) (citing Wichita County v. Hart,
917 S.W.2d 779, 784 (Tex. 1996)). 
24. See id.
25. See id.
26. As expressed earlier, Murillo's affidavit states: "Because I knew Belinda Diaz' conduct was in
violation of the law and subject to criminal prosecution, I knew I had to report Ms. Diaz's violation to my
superior, Ms. Sarabia."
27. Llanes, 64 S.W.3d at 642 (although employee need not identify specific law when making report,
or establish actual violation of law, there must be some law prohibiting complained-of conduct to give rise to
whistleblower claim).
28. See Tex. Gov't Code Ann. § 554.001(1) (Vernon Supp. 2006).
29. Tex. Gov't Code Ann. § 552.352(a) (Vernon Supp. 2006).
30. Id.
31. Id. § 552.101 (Vernon Supp. 2006).
32. Tex. Fam. Code Ann. § 231.108(a) (Vernon Supp. 2006).
33. See Op. Tex. Att'y Gen. No. OR-2003, 2003 Tex. AG LEXIS 3036, *3-4 (Apr. 7, 2003).
34. The terms "case screen" and "notepad" are names given to the confidential document taken by
Diaz.
35. See Tex. Gov't Code Ann. § 552.352(a) (Vernon Supp. 2006).
36. Id. We have reviewed Murillo's exhibit A-1, which was attached to her affidavit. The exhibit, a two-page document entitled "Confidentiality and Procedures," provides guidelines as to when information can and
cannot be released. Most of the information contained therein generally pertains to the disclosure of
information. The document further states that guideline violations "can be grounds for dismissal, in addition
to civil and criminal prosecution." The rules adopted by the OAG to safeguard against disclosure, do appear
to be adopted pursuant to statute. See 42 U.S.C.A. § 654(26) ("A state plan for child and spousal support
must have in effect safeguards, applicable to all confidential information handled by the State agency, that
are designed to protect the privacy rights of the parties[.]"). Section § 654(26), however, while focusing on
the disclosure of information, does not prohibit the removal of confidential information from the workplace. 
Id. As a result, we ultimately conclude that in this case, Diaz's act of taking confidential material out of the
workplace, without more, simply violated an inner-office policy that was not established pursuant to any
statute.
37. Castaneda, 831 S.W.2d at 503-04 (emphasis added).
38. Id.
39. Murillo submitted into evidence an email written by Barbara VanderVoord to Norma Villa, a fellow
attorney at the OAG's office. In the email, sent less than an hour after Murillo's report to VanderVoord, 
VanderVoord (1) states that Elsik told Murillo of Diaz's conduct, (2) specifically identifies the confidential
information taken by Diaz, and (3) describes the conversation shared by Elsik and Diaz regarding the
document's confidentiality. Based on the evidence, it is clear that the information in VanderVoord's email
stemmed from Murillo's report.
40. The evidence in this case, taken collectively, appears to indicate that Diaz's lawsuit was common
knowledge among those who worked with her.
41. Testimony from Murillo and other witnesses reveals that Murillo ultimately confronted Diaz,
questioned whether she had been supplying her attorney with confidential information, and that Diaz admitted
to doing so.
42. Our inquiry is formulated in part from both the Texas Supreme Court's language in Wichita County
v. Hart, 917 S.W.2d 779, 785 (Tex. 1996) ("an employer that takes prohibited action against the employee
violates the Whistleblower Act only if a reasonably prudent employee in similar circumstances would have
believed that the facts as reported were a violation of law"), and our interpretation of the phrase "reports a
violation of law" in Castaneda, 831 S.W.2d at 503-04.
43. Tex. Gov't Code Ann. § 552.352(a) (Vernon Supp. 2006).